188 So.2d 224 (1966)
Regina ORTOLANO, wife of Philip James SCIORTINO
v.
Philip James SCIORTINO.
No. 2248.
Court of Appeal of Louisiana, Fourth Circuit.
June 6, 1966.
Rehearing Denied July 5, 1966.
*225 Herman & Herman, Walter D. Kelly and Thomas M. Brahney, III, New Orleans, for plaintiff-appellee.
Joseph S. Russo, Metairie, for defendant-appellant.
Before REGAN, YARRUT and BARNETTE, JJ.
BARNETTE, Judge.
This is an appeal by the husband from the final judgment of the trial court granting a separation from bed and board to the wife, appellee herein. The judgment further awards custody of the four minor children to the mother; fixes visitation privileges, spelling out in detail the conditions and limitations of visitation; and awards judgment in favor of the wife for support of the children in the sum of $300 per month.
The extent of the bitter litigation between these parties is indicated by the twelve judgments rendered by the trial court on various aspects of this suit during litigation in that court on such matters as rules for custody, visitation privileges, child support, injunction and contempt, as well as the final judgment of December 20, 1965, from which this appeal was taken. The record before us also discloses that there was another rule for contempt and judgment thereon after the appeal was taken to this court. An earlier suit for separation between these parties, No. 394-325 in the Civil District Court for the Parish of Orleans, resulted in a judgment in favor of the wife on February 8, 1962, following which there was a reconciliation. In another section of the district court the husband brought suit seeking a partition of certain property alleged to be owned in indivision and certain property alleged to belong to the previously dissolved community. An appeal from the judgment in that suit is now before this court in case No. 2287, La.App., 188 So.2d 221.
We agree with the appraisal of the litigants by the trial judge who, in disposing of the latest rule for contempt (after the appeal in the present matter was taken), said:
"Each party to this litigation is a personality who refuses to give in to any of the considerations of the other person, and the Court has been repeatedly called upon to be a referee between them and does its best efforts to protect them against each other."
Notwithstanding that the wife, appellee, has succeeded in obtaining a judgment in her favor granting all for which she prayed, apparently she is dissatisfied with the judgment, for she has answered the appeal.
In his reasons for judgment given orally at the conclusion of the trial and arguments and recorded in the transcript of testimony, the trial judge held that the wife had proved the husband's abandonment and awarded her a judgment on that basis. He rejected the wife's charge of cruelty and her allegation that the parties had lived separate and apart for more than a year. In her answer to the appeal the appellee prays that the judgment be amended to show that it is based on physical and mental cruelty and living separate and apart for more than a year. Counsel for plaintiff-appellee states in his brief: "The sole reason for answering this appeal is for the purpose of showing that defendant-appellant's appeal is purely frivolous." We rather think, however, he would not have answered the appeal to seek amendment of a judgment granting everything for which his client had prayed, unless he was aware of the weakness of his case and the doubtful validity of the judgment resting solely on abandonment. Apparently he seeks affirmation on a more substantial basis.
It is our opinion that the judgment of separation from bed and board cannot be *226 sustained on the ground of abandonment under the pleadings and testimony in the record before us.
Abandonment of one of the spouses by the other is cause for separation from bed and board under LSA-C.C. art. 138, but we must look to Articles 143 and 145 to find the rules for application of this cause. These articles provide as follows:
"Separation grounded on abandonment by one of the parties can be admitted only in the case when he or she has withdrawn himself or herself from the common dwelling, without a lawful cause, has constantly refused to return to live with the other, and when such refusal is made to appear in the manner hereafter directed * * *" (Emphasis added.) LSA-C.C. art. 143.
"In all suits filed hereafter, whether or not there has been an answer filed, the abandonment with which the husband or wife is charged shall be proved as any other fact in a civil suit and such case shall be set and tried as any other suit." LSA-C.C. art. 145.
It will be seen immediately that one of the essential elements of abandonment as a cause for separation is that the spouse "has constantly refused to return to live with the other." In this case this element is neither alleged nor proven. On the contrary the evidence is conclusive beyond any doubt that the defendant made several attempts to return, if indeed he did "withdraw from the common dwelling, without lawful cause," and that his attempts to return were met by the wife's resistance and declarations of intent not to live with him again. Furthermore, he was enjoined by the court not to return.
In plaintiff's original petition filed December 1, 1964, wherein she charged abandonment, she merely alleged:

"IV.
"Defendant abandoned petitioner, leaving the matrimonial domicile, 912 Constantinople Street, on October 14, 1964, and petitioner and defendant have not lived together since that date."
Then in her first supplemental and amended petition she alleged:

"XVI.
"That defendant agreed, in order that his children not know of his conduct as set forth above and as will be produced at the trial, that his wife sue him for separation on the grounds of abandonment and that she could remain in the premises, 912 Constantinople Street, and that she would not seek alimony for herself. Defendant did, in fact, leave the premises stating that he would never return, but on the evening of December 4, 1964, he forced his way into the premises, threatened petitioner with her life, stated that he would not leave the premises, whereupon she was forced, for her own safety, to remove herself therefrom."
Not only did she fail to allege the essential element of constantly refusing to return to live with her, but the allegation in the supplemental petition quoted above shows on its face that he did in fact return.
Her allegation reveals that there was an agreement that he would leave and that she would not seek alimony for herself. This allegation flatly negates abandonment and contradicts Article IV of her original petition. This, considered along with the other reasons for his withdrawal from the home, more fully discussed below, fails to establish affirmatively that his leaving the home was without lawful cause within the meaning of LSA-C.C. art. 143.
The plaintiff-appellee testified that defendant returned to the home on October 18, bringing with him their small child who had been visiting with him. She was not at home when he arrived, and when she returned and saw his car parked outside she was greatly upset. She accused him of "brainwashing" her father, who lived in the home. The defendant locked himself in an *227 upstairs apartment; and plaintiff said to her father, "Papa, I love you and I respect you, but I am not going to live with this man." Her testimony contains the following explanation of her attitude at that time:
"A Because my mind was made up that I was no longer going to continue this marriage. He had just agreed a few days before to leave, he threw the keys on the desk, `I'm leaving, don't get in touch with me,' and I didn't want to be subjected to this humiliation of him coming in and out and my mind was made up that I was finished * * *"
She left the house taking her son to spend the night at a local hotel, and defendant was gone when she returned the next day.
On November 1, plaintiff went to a local hospital because of her severe emotional upset, and during her six-day confinement there defendant was in the home. He did not remain after plaintiff's return. About a week later he returned to the home and again was in conversation with his father-in-law when plaintiff returned from a PTA meeting. She again accused him of "brainwashing" her father, and a violent argument ensued which continued out on the street until neighbors intervened. On December 4, defendant returned to the home and, according to plaintiff's testimony, said, "This is my house and I'm not leaving." Plaintiff then left the house taking some personal things and stayed at her brother's home that night.
On December 8, the first supplemental and amended petition was filed. Pursuant to this petition a rule to show cause was directed to defendant and on December 18, after a hearing, defendant was ordered to vacate the premises and not to interfere in any way with the occupancy of the plaintiff and their four minor children. That injunction has not been lifted.
From the foregoing facts, as well as the pleadings, it is clear that the plaintiff has failed to prove the essential element of "constant refusal to return" to the matrimonial domicile "to live with" his wife.
Abandonment within the intendment of LSA-C.C. art. 138(5) does not exist merely by an act of withdrawal from the matrimonial domicile, but must be evidenced by the constant refusal to return. LSA-C.C. art. 143. Prior to Act 82 of 1958 this proof of abandonment, where no answer was filed, was required to be made by the issuance of summons to the abandoning spouse ordering him to return. If the spouse did return in response to the summons, there was no abandonment. The only change made by Act 82 of 1958 is that the summons to return is no longer required and proof of the abandonment is now made as in any other civil suit. The underlying principle and the reasons for this cause of separation from bed and board have not been changed. A timely return to the matrimonial domicile without summons would no less nullify the abandonment. The judgment based solely on the ground of abandonment cannot be sustained.
Having come to this conclusion, it is probably unnecessary for us to discuss the facts surrounding defendant's withdrawal from the home on October 14, the alleged date of abandonment, or whether such withdrawal, under the circumstances, was an abandonment. However, it should be said that both plaintiff and defendant testified that their priest, who for a long time had tried to bring them to a peaceful settlement of their conflicts, was present when defendant left. The priest, according to plaintiff's version, said: "Phil, I have gone over this again with Regina and the only thing I can see for you to do is to leave." Defendant's version is that the priest said: "Phil, why don't you go off for a couple of days and I'll get a chance to talk with her. I'll come back and check with her." According to defendant this is why he left, hoping that things would "cool off" and the priest could effect a settlement.
In his reasons for judgment dictated into the record at the conclusion of the trial, *228 the trial judge found as a fact that defendant did leave on October 14, that there was no justification for his leaving, notwithstanding the advice of the priest, that he stayed away from home for several days, and that when he did return it was not for the purpose of reestablishing his marriage "because every time that he did return to the domicile, an argument ensued between the parties." He held that defendant's intention on leaving on October 14 was to abandon his domicile and his family and that "if he changed his mind later on, which evidently he did, and wished to return" that it was not the obligation of his wife to welcome him back. The trial judge said:
"* * * As a matter of fact, the wife made every effort not to have reconciliation, which was testified to by both the plaintiff and the defendant."
Counsel for plaintiff argues, with good authority, that the factual findings of the trial judge should not be reversed except for manifest error. We are not in serious disagreement with the trial judge on the facts, but we do not concur in the legal conclusions drawn therefrom.
From the foregoing findings of fact by the trial judge, specifically that the husband changed his mind and wished to return and that the wife was determined not to reconcile, the wife cannot be heard to say that the husband has constantly refused to return to live with her and that the whole responsibility for not reestablishing the marital relationship was his. It then becomes her refusal to live with him and contradicts his abandonment of her. If she feels justified in refusing to receive him back because of his prior conduct and marital faults, she might refuse to live with him for these reasons and seek judicial separation on appropriate grounds as provided by LSA-C.C. art. 138.
The other two grounds upon which plaintiff bases her prayer for separation are cruelty, as alleged in her first supplemental petition, and voluntarily living separate and apart for more than one year, as alleged in her second supplemental petition which was filed October 25, 1965. Both of these causes were rejected by the trial judge. We find no error in his judgment in this respect.
We adopt as our own the following finding of the trial judge on the charge of cruelty:
"With reference to the charge of cruel treatment, both mental and physical, although there is substantial evidence that the parties to this litigation are in continuous arguments, and disagreements to such an extent that their living together has been rendered insupportable, that it is unbearable, and which renders a harmonious cohabitation as impossible between the parties, yet the evidence does not substantiate the specific charges of cruel treatment alleged in the petition to such as [sic] extent as to make the defendant fully responsible therefor. And it would appear to the Court that many of the arguments were, and resulting treatment which is termed as cruel, were brought about by the actions of both the parties. And the Court cannot place the blame only on the defendant in this case."
There is much testimony on the violent quarrels between Mr. and Mrs. Sciortino, but it is impossible to conclude that they were provoked more by the husband than by the wife. It is apparent that the catering business, which began before their first separation as a small business conducted from the home, has now grown into a profitable enterprise. While Mrs. Sciortino attempted to discount the contributions of Mr. Sciortino to its success, it is a fact that he has been of significant help, while at the same time engaged in his own employment from which material contributions were made to the community. Mrs. Sciortino, however, is the one to whom the major share of credit must be given for the success of the catering business.
The long and arduous hours of labor which Mrs. Sciortino devoted to their business *229 venture, often into the early morning hours, was one of the causes of conflict between them. Mr. Sciortino complained that this interfered with her duties toward him and the children. Mrs. Sciortino complained that her husband was not helpful enough. Mrs. Sciortino reached a point of such independence in her business that she found it more pleasant, at no economic sacrifice, for Mr. Sciortino to be out of her way, out of the house, and out of her life. There is no doubt that she was and is determined to achieve this end. Had the catering business not been established on the premises of the home we have no doubt that Mrs. Sciortino would have left the home to Mr. Sciortino and established residence elsewhere. She can't leave him without giving up the profitable business they have established in the home. She has done everything she can to make Mr. Sciortino leave, but he refuses to do so voluntarily.
The acts of alleged physical cruelty have not been proven although there was testimony of a hitting or "pushing" incident, the time of which was not established definitely and might have preceded the first separation suit. Other incidents of alleged physical encounter and cursing are no more chargeable to the husband than to the wife. We therefore find, as did the trial judge, that the faults are mutual and plaintiff has failed to make out a case of cruelty to support a judgment of separation. Callahan v. Callais, 224 La. 901, 71 So.2d 320 (1954); Temperance v. Herrmann, 191 La. 696, 186 So. 73 (1938); Gormley v. Gormley, 161 La. 121, 108 So. 307 (1926).
On the final alleged cause for judgment of separation, voluntarily living separate and apart for more than a year, the trial judge, in rejecting it, pointed out that the defendant had been enjoined from attempting to live with his wife during the year in question.
Counsel for plaintiff contends in his brief that "where married parties separate, and the separation as to at least one of the parties, was voluntary from its inception and continuous thereafter throughout the statutory period, the party who seeks it may be granted a separation from bed and board on the grounds of having voluntarily lived separate and apart for more than one year," citing Otis v. Bahan, 209 La. 1082, 26 So. 2d 146, 166 A.L.R. 494 (1946). We must reject the conclusion which counsel has drawn from the Court's opinion in that case.
Otis v. Bahan was a suit for a divorce based on the provisions of Act 430 of 1938 which provided that when married persons have lived separate and apart for a period of two years or more, either party may sue for and obtain a divorce. There the Court said:
"* * * The separation intended by the statute is a separation by which the marital association is severed. It means the living asunder of the husband and wife. It is a voluntary act, and the separation must be with the intent of the married persons to live apart because of their mutual purpose to do so, or because one of the parties with or without the acquiescence of the other intends to discontinue the marital relationship.

"To constitute the voluntary separation required by the statute, it must appear that the separation upon the part of at least one of the parties was voluntary in its inception and was continuous throughout the statutory period. * * *" (Emphasis added.) 209 La. at 1088, 26 So.2d at 148.
See also Leveque v. Borns, 174 La. 919, 142 So. 126 (1932).
Act 430 of 1938 made no requirement that the living separate and apart be by mutual consent, hence we must agree with the interpretation of the act in Otis v. Bahan. The distinction here is that plaintiff does not seek a divorce under Act 430 of 1938, now LSA-R.S. 9:301 as amended by Act 31 of 1960, but rather she seeks a separation from bed and board under LSA-C.C. art. 138(9) which provides for separation from bed and board, "[w]hen the husband and *230 wife have voluntarily lived separate and apart for one year and no reconciliation has taken place during that time."
The inclusion of the word "voluntarily" which does not appear in LSA-R.S. 9:301, or any of its predecessor statutes[1] providing for divorce after living separate and apart for a specified time is materially significant.
It is our opinion that it requires a mutual acquiescence in the living apart during the time required. It must be a mutually voluntary act, and it is not enough that it be voluntary only as to one of the parties. We are unable to find any case from the appellate courts of this State interpreting the meaning and significance of the word "voluntarily" as used in Article 138(9), but we do find support for our opinion in Pascal, Legislation Affecting the Civil Code and Related Subjects, 17 La.L.Rev. 22 (1956), wherein he said:
"* * * The important words in the statement of the new cause for separation are `when the husband and wife have voluntarily lived separate and apart.' (Emphasis added). Grammatically and lexicographically this legislation requires that the separate living be mutually voluntary. R.S. 9:301 does not have the word `voluntarily' in its text and the judicial interpretation has been that the separate living must be the result of a voluntary or intentional act on the part of at least one of the parties, but not necessarily of both, to terminate the conjugal life. [Citing Otis v. Bahan, supra, and Leveque v. Borns, supra.] Thus the living separate and apart required by the new legislation, if construed according to the normal meaning of words in the English language, is more limited than that required by R.S. 9:301 as interpreted."
Regardless of the cause or intention of the parties at the time of defendant's withdrawal from the home on October 14, 1964, the living separate and apart from that date has not been mutually voluntary and cannot therefore sustain a judgment of separation from bed and board in favor of the wife as to whom, alone, the continued living separate and apart has been voluntary.
We are cognizant of the apparent hopelessness of this marriage. It is folly to assume that the attitudes of plaintiff and defendant toward each other will be made more tolerable no matter what decree the court pronounces. We have not been unmindful of the futility of a continuation of the legal bonds of marriage between these two incompatible persons, nor of the consequences which will inevitably follow our decree, but there is no law in this State to justify a separation from bed and board or divorce merely because of incompatibility and mutually antagonistic attitudes of the spouses. Both parties are at fault, and it is difficult to determine which one of them is at greater fault. Since they are mutually at fault, they must be left in the situation they have brought upon themselves. Callahan v. Callais, supra.
If their separation should continue until two years have passed, even though it be voluntary only as to the wife, perhaps then she can invoke the authority of Otis v. Bahan, supra, and Leveque v. Borns, supra, but as the matter now stands the court is powerless under our statutes and jurisprudence to relieve them of the intolerable situation they have brought upon themselves.
For these reasons the judgment appealed from is reversed and there is now judgment in favor of defendant, Philip James Sciortino, rejecting plaintiff's demands and dismissing her suit at her cost.
Reversed.
NOTES
[1] Act 269 of 1916 and Act 31 of 1932.