REDMANN, Judge.
A wife sued and her husband reconvened, each for separation from bed and board on grounds of cruelty (the husband adding abandonment). From judgment for the wife the husband appeals.
Although surely not unique, this transcript would bear reading by every member of the Legislature. It exemplifies the public debasement our separation-for-fault system thrusts upon unhappy spouses who are really not bad people. Variations on Albee’s “Who’s Afraid of Virginia Woolf?” supply the roles to be portrayed by husband and wife, obliging them to condemn, belittle, expose and batter each other before strangers: to denounce pettiness, idiosyncrasy and fault of one’s spouse while unwillingly revealing one’s own.
Louisiana’s Civil Code, like the Code Napoleon’s projet, never contained the equivalent of C.N. art. 233’s “mutual and persevering consent” of the spouses as establishing “that their living together is insupportable and that there exists, in their case, a peremptory cause for divorce.” (16 West’s LSA-C.C. p. 83, under art. 139, La.C.C.Comp.Ed.) After 1884, when C.N. art. 233 was suppressed, and cause for divorce became more restricted, says Planiol, Civil Law Treatise (La.Law Inst, trans.), I, No. 1156, consenting spouses created fictitious causes, and “Judges are not un *859 aware of the comedies being played before them. They close their eyes.” More modern French practice amounts to “divorce by agreement.” Planiol opines “It would be more worthy for the court and for the law to authorize frankly such divorces.”
Louisiana has had, since 1916, a fault-immaterial divorce law, whose living separate requirement has been reduced to two years; R.S. 9:301. Similarly, C.C. art. 138(9), enacted in 1956, allows separation after one year of “voluntary” separation (meaning acquiesced in by both spouses, Sciortino v. Sciortino, La.App. 1966, 188 So.2d 224, writ refused, 249 La. 726, 190 So.2d 237). This compassionate legislation has done much towards sparing already sorrowed spouses the public humiliation of accusations and recriminations.
However, until the required period of separation has passed, unless the wife is willing to initiate an action for separation or divorce based on fault, there is no law enabling her to sue for alimony (although in some circumstances some relief might be obtained under the criminal nonsupport statute, R.S. 14:75; see Reporter’s Comment thereunder; also Marchese v. Schulte, La.App.1970, 235 So.2d 605; also Hargrave, “Work of the Louisiana Appellate Courts”, 32 La.L.Rev. 165). Even then, permanent alimony disputes often require a repeat performance of the indecent exposure.
Apparently we need more fault-immaterial legislation, at least for temporary alimony (and perhaps permanent alimony based on need and ability to pay, but also upon, e. g., the number of years the marriage endured, rather than freedom from fault in its dying). Until some such legislation allows repeal of our fault-based separation law, our citizens whose marriages have not worked out will continue to face degradation.
Here, after over 25 years of marriage, the unfortunate spouses denounced each other by alleging several ungracious, unthoughtful or unkind attitudes and deeds. Except for the wife’s having been 'the spouse to finally leave the home (though by agreement she later returned and the husband left), the testimony of each is denied by the other. The two daughters (one 21 and one 25) no longer speak to one another; each testified, one called by each parent. One daughter’s two husbands testified, one for each spouse. Two brothers of the wife testified, one for each.
The trial judge’s very helpful reasons for judgment note the “family divided” and the contradictory character of most of the testimony. The reasons assert reliance on three less identifiably partisan witnesses : a friend of the younger daughter, the older daughter’s first husband, and the wife’s doctor.
Because we reverse the trial judge, we treat the testimony at unusual length.
First, we agree that the family’s testimony here ought not to be the basis of a judgment.
Doubtless the wife had some causes for disappointment, but she saw some things exaggeratedly, as is only natural in this type of case.
Her petition pleaded her husband’s calling her crazy as cruel treatment: “but won’t you admit that he used the term * * * with no particular significance as to psychiatric problems, isn’t that a fact? A. No; he meant it. Q. Well, how do you know that he meant it? A. For instance, when my daughter Darleen was going into the hospital — in fact, she was in the hospital and already in labor ready to have her baby delivered, [younger daughter] Susan and I were leaving the house because [Darleen’s husband] Johnny called and said there was no one there, to please come up there with him [sic]. All right. We were leaving the home at the very same time when Fred arrived from work. Well, we were all excited, Darleen was going to have her baby. We wanted to go. He said, ‘Well, you all are crazy, we didn’t even eat yet.’ And he refused to go. His *860 own daughter doesn’t know that he refused to go to the hospital for his grandchild to be born. Q. That was the vein in which he used the word crazy, is it not? A. It was all the time, any time.”
While the wife had other complaints about her husband (whom she described as “Mr. Big” when criticizing his disinclination to drive her to the hospital on one occasion), the only other we address is the petition’s allegation he “maintained a collection of pornographic material consisting of films, books and magazines” over her objection and to her humiliation.
We here note that we do not discuss this complaint with a view that either (a) having in one’s possession explicitly sexual prurience-oriented materials or (b) maintaining a collection of anything (e. g., stamps?) over a spouse’s objection, constitutes an excess, cruel treatment or outrage. It is especially unseemly for this spouse, who herself complains that her husband “wanted to have his way”, to assert as grounds that she wanted to have her way on a matter (i. e. simple possession) that concerned her not. We discuss the complaint because of her assertion that the alleged collection was maintained to her humiliation.
Her (contradicted) testimony generalized that pornography had been in her home for 25 years; her bedroom became a pornographic projection room. She said that after her return from a doctor-recommended vacation, in connection with his invitation to her to “be a wife * * * well, marital relations”, he began to show her a film which she watched for “about three seconds” and became “hysterical”. The wife knew, for some time before she left, that her petition for separation was to be filed; it was filed two days before she left the home (a point we do not consider). Yet she obtained, as evidence of the “pornography collection”, only one pulp paperback book (he said a friend gave him) and photocopies of a letter and check ordering films which he described as medical sex films, and which arrived after the breakup. The wife also had those films and sought to introduce them. She did not explain why some film and other parts of the alleged 25-year collection were not taken by her to prove her complaint. (Daughter Susan said one couldn’t clean house without encountering it; daughter Darleen said she never saw any.)
The husband’s complaints were of cruelty by indifference and lack of sexual relations during the last six months, and of abandonment. We conclude the wife’s heart ailment and “severe anxiety”, testified to by her doctor, satisfactorily show her sexual abstinence was not wholly voluntary. Her additionally blaming “being subjected to pornographic filth” does not detract from the medical justification. Except for complaint of the wife’s relationship with an older, male friend of her late mother (unworthy of further comment), the husband’s other testimony is little more than a denial, point for point, of the wife’s allegations.
We conclude, as apparently the trial judge did, that the family testimony would not suffice for judgment. But we disagree with the trial judge that that of the three witnesses he deemed less partisan resolves the matter in the wife’s favor.
The testimony of Roslyn Harris, the younger daughter’s friend of ten years and a visitor “at least weekly, sometimes quite more frequently, * * * sometimes almost daily” may indicate her resentment at the husband’s coolness towards her frequent visits, perhaps especially for dinner. But it does not assert grounds for separation for cruel treatment.
She does say, in answer to one question asking how the husband “behaved toward his wife”, that the husband “would criticize her * * * He was frequently rude to me.[1] * * * ” Later, “Q. Now, would he quarrel with her? A. Not di *861 rectly in my presence. * * * I could hear them quarreling. I did not hear what they said, but you could hear voices shouting. * * * Q. Did you find this behavior [“such unkindness, such criticism”, the witness generalized] offensive? A. Yes, the injustice of it offended me. * * * I think she was offended, but she would try to make little of it. * * * ” Again, “I rarely got more than a greeting. Quite often he would be argumentative at the dinner table. He rarely addressed me other than to say hello. Quite often, when he was watching television, I would be completely ignored. That was not unusual, he ignored Susan; he ignored his own wife most of the time. I was never made welcome in that house, not by him. I was always Mrs. Brown’s guest, or Susan’s guest.”
Later, “of course I am not qualified to say, * * * but I was aware that she had a heart problem* and that it was brought on mainly — ” Objection, sustained.
The witness also testified the husband in the wife’s presence would talk “about his old girl friends” (sic; not about intimacies with old girl friends). “Q. Did this appear to be embarrassing to Mrs. Brown? A. Yes, it would. I don’t know how embarrassed she was, but like I say, she would pass it off with a joke. I don’t imagine she would show her real feelings whether she was very hurt or very embarrassed.’’
One specific item was finally testified to: “He would nag her to have the dinner on time; to have this, to have everything, to have her bring various things to the table * *
On cross, the witness testified the rapport between Susan and the husband was “non-existent.” (The witness denied she expected too much of fathers, though she lived with her own father: she said “My mother is an alcoholic. I cannot live with my mother.”) The witness admitted that she did on occasions call Susan on the phone “after 12 o’clock at night”, to which Mr. Brown, she said, “never voiced those objections to me.”
Finally we quote Miss Harris’s response to “Now, you haven’t mentioned the other little girl, Darleen. What was his attitude towards Darleen? A. I am glad you asked that. I knew Darleen very well before she married her first husband and moved out. * * * he was never very kind to her either. He would refer to her as a juvenile delinquent. And I remember on one occasion when Susan and Darleen and I were going to roller skate at some roller rink. He objected about having to drive us there, complained about the cost of admission.”
Howsoever guileless her face and demure her demeanor (which the trial judge could and we cannot see), this witness’s words disprove the trial judge’s evaluation of her testimony as that of a disinterested witness. What she says is not the testimony of a bystander, but that of a partisan who has joined the unfortunate fray. And she says very little, expressing conclusions only, unsupported by specific instances.
The testimony of Robert Wallace, Dar-leen’s first husband, does not appear equally affected by bias, despite his divorce from Darleen (and her taking her father’s side and no longer being on speaking terms with her mother and sister). But, asked to “describe the manner in which Mr. Brown behaved”, he replied “embarrassing, erratic. I would feel like I was not welcomed; or most people would * * *. For instance, if I would go there for a meal, he would complain in front of guests about the price of the meal, things like — well, I felt like I was taking something out of his mouth just by being there. * * *.” This conduct occurred “mostly when we were eating.” Brown’s behavior (as described?) “upset” the wife; “people were upset” when Brown was at home, and there was “an air of relaxation” when he was not. He treated his daughters “very poorly”. And “he talked pretty much about his affairs, during, say, World War *862 II * * * in the presence of anybody that was there.”
From these two witnesses it may be concluded that Brown showed displeasure at their apparently frequent presence as guests at his table, although not so offensively as to cause them to visit only at times other than meal time, or to reduce the frequency of their visits for meals. If treated like unwelcome freeloaders at the table of a man with financial problems, they were able to forgive, if not forget, his “embarrassing” behavior.
It may also be concluded that there was tension. It may not be concluded that Brown behaved so cruelly towards his wife as to render their living together insupportable (although it may well now be insupportable).
Mrs. Brown’s internist testified that “severe anxiety” “affected her heart and affected the chronic recurring chest pain” of angina. She had one heart “attack” (a myocardial infarction) in March of 1966. Her family history included heart ills and her father died of a heart attack; and heredity is a significant factor in heart conditions. “Marital problems” could be a cause (of the underlying anxiety) and “she said that it was." Brown’s attitude? “Well, he never did say much. I couldn’t say that I was impressed with his being reluctant to talk much, which in this particular case was not, you know, necessarily unusual.” The doctor explained to the husband “how much her nerves had to do with her being sick; and I explained my ideas of what was making her nervous, what was aggravating her nervousness. Q. And were you successful in explaining this idea to Mr. Brown? A. I don’t think so, but that’s my opinion.”
It must be accepted as proven that this marriage became a source of ill health for the wife, and that the spouses’ living together has become indeed insupportable. What is not proven is that “excesses, cruel treatment or outrages” by the husband were the cause of the insupportability.
Yet the husband also has no ground for judgment of separation. The wife’s leaving home is justified by the very clear and convincing medical evidence: her health demanded it. Again, the underlying cause of the marriage’s putrefaction is not proven.
Perhaps this case is best described as one of “disappointment in the marriage relation and mere incompatibility of temper”, which has often been said not a legal cause for separation. Gormley v. Gormley, 161 La. 121, 108 So. 307, 308 (1926); see also Temperance v. Herrmann, 191 La. 696, 186 So. 73 (1938); Schneider v. Schneider, 214 La, 759, 38 So.2d 732, 735 (1949).
These spouses evidently had different outlooks on important aspects of married life, from the act procreative of children to the rearing of children. Their differences may well be irreconcilable, especially after their bitter, spleen-venting courtroom fracas. But divorce must come from the fault-immaterial source of R.S. 9:301, whose two-year separation requirement has (presuming no reconciliation) by now been met.
The judgment of separation in favor of the wife is reversed and her demand for separation dismissed, and the judgment rejecting the husband’s demand is affirmed, at the cost of the community.
BAILES, J. Pro Tern., concurs in the result.

. Emphasis here and elsewhere in testimony is supplied.